IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

03 JUN 30 PM 4:41

U.S. DISTRICT COURT
N.D. OF ALABAMA

BETH E. ADUBATO,            )
                           )
        Plaintiff,          )
                           )
v.                          )   CASE NO. CV-01-TMP-2527-S
                           )
MG BROADCASTING OF          )
BIRMINGHAM, INC. d/b/a      )
WIAT-TV, a corporation,     )
                           )   **ENTERED**
        Defendant.          )
                               JUL - 1 2003

## MEMORANDUM OPINION

This action is before the court on defendant MG Broadcasting
of Birmingham, Inc. d/b/a WIAT-TV's ("WIAT") motion for summary
judgment, filed November 25, 2002.  Plaintiff Beth E. Adubato
("Adubato") responded to the motion by filing a brief in opposition
on December 26, 2002, along with a motion for leave to file out of
time.  The defendant filed a reply brief on January 3, 2003.  The
parties have consented to the exercise of jurisdiction by the
undersigned pursuant to 28 U.S.C. § 636(c).

## I.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment
is proper "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to judgment as



a matter of law." Fed. R. Civ. P. 56(c).  The party seeking
summary judgment "always bears the initial responsibility of
informing the district court of the basis for its motion, and
identifying those portions of 'the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the
affidavits, if any,' which it believes demonstrate the absence of
a genuine issue of material fact." Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant
can meet this burden by presenting evidence showing there is no
dispute of material fact, or by showing that the nonmoving party
has failed to present evidence in support of some element of its
case on which it bears the ultimate burden of proof. Celotex, 477
U.S. at 322-23.  There is no requirement, however, "that the moving
party support its motion with affidavits or other similar materials
*negating* the opponent's claim." Id. at 323.

    Once the moving party has met his burden, Rule 56(e) "requires
the nonmoving party to go beyond the pleadings and by her own
affidavits, or by the 'depositions, answers to interrogatories, and
admissions on file,' designate 'specific facts showing that there
is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P.
56(e)).  The nonmoving party need not present evidence in a form
necessary for admission at trial; however, she may not merely rest
on her pleadings. Celotex, 477 U.S. at 324.  "[T]he plain language

2

of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."

3

<u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

## II. FACTS

Applying these standards to the evidence before the court, the following facts appear to be undisputed or, if disputed, taken in a light most favorable to the plaintiff.  Plaintiff Beth Adubato brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et seq.</u> ("Title VII"), the Equal Pay Act ("EPA") of the Fair Labor Standards Act, 29 U.S.C. § 206(d)(1), <u>et seq.</u>, and under state law.  Adubato's Title VII claims allege that she was subjected to a hostile work environment and was terminated because of her complaints of harassment.  Further, she alleges that she was paid less than males at WIAT in violation of the Equal Pay Act.  Adubato also alleges state-law fraud claims, asserting that WIAT engaged in fraud and suppression when negotiating her employment contract by telling her she would work only in sports.

Before coming to work in Birmingham, Adubato worked for television stations in Alpena, Michigan, and Erie Pennsylvania.  It appears that she worked primarily as a news anchor or reporter. She began working for WIAT in Birmingham, Alabama, on July 24, 1998, after being hired by by Micah Johnson, a male, who was news

4

director at WIAT at the time.  Johnson told her she would cover
sports.  They discussed the sports format, and she wrote and
produced a sportscast as part of the interview process before being
employed.  With the assistance of an agent and an attorney,
plaintiff negotiated an employment contract with WIAT, which was
signed on July 19, 1998.  She was paid a starting salary of $42,000
per year.  The contract described Adubato's position as "full-time
Weekend Anchor and artistic professional at WIAT's television
station at Birmingham Alabama."  The contract further states that
"Adubato also acknowledges that the scope of her duties is entirely
within the discretion of WIAT and may be changed by WIAT at any
time."[1]

About a month after Adubato's arrival at WIAT, Micah Johnson
was terminated and replaced by Mark Toney, a male, who was named as
interim news director.  During the first month of her employment,

---

[1]   Although there is an assertion in Plaintiff's brief in
opposition to defendant's motion for summary judgment (footnote 4)
that the contract submitted with defendant's motion for summary
judgment may not be the original contract Adubato signed, there is
no evidence that it is not the original contract that Adubato
signed.   In Adubato's deposition, she testified that it was
possible that all of the provisions that were in the contract
produced by defendant were in the contract she alleges to have
signed.   She testified that she did not remember reading the
contract, and does not have a recollection of any different or
additional terms that may have been in the contract she alleges to
have signed. There is no other evidence of how the contract may
have differed.   Plaintiff's unsubstantiated belief that the
contract produced by defendant is not the contract she signed is
insufficient to create a genuine factual dispute about the
contract.

Adubato was given assignments by a sports producer, but after Toney arrived, he began to assign Adubato to news stories.  As early as August 1998, plaintiff was given news assignments over sports assignments.  Plaintiff's complaint asserts that, when Adubato was sent to cover a news story in Jasper, instead of an Auburn football game in 1998, it became "clear" that Adubato was not going to be assigned to sports stories except on weekends.

While employed at WIAT, Adubato had three supervisors: Micah Johnson (for about a month), Mark Toney (for only few months), and Peggy Johnson.  Toney left in 1998, and was replaced by Johnson, a female, late in 1998.  Eric Land, a male, was president and general manager of the station.  Susan Ellenburg, a female, was human resources coordinator.  Paul Finebaum, a male, worked as sports anchor at WIAT during the relevant time, but did not supervise Adubato.  Paul Gorley, a male, worked as a sports producer, which also was not a supervisory role.

Within about a month after Adubato was hired, Toney told her that WIAT did "joke sports" and that is why they hired a woman to cover the sports broadcasts.  When Toney discussed what Adubato thought she would be doing at WIAT, Adubato described her work as sports in an "intelligent but offbeat kind of ESPN style ... highlights but with a more intelligent subsequent take than your average highlight."  Toney said WIAT did not do those kinds of sports, but rather they did "joke sports."  Adubato said: "[I]f

you're going to do joke sports then you really shouldn't have hired a woman because everyone knows it's a big issue women doing sports. We have so much stocked [sic] against us in credibility that you can't do joke sports ... you shouldn't have hired a woman." Toney replied, "That's exactly why we hired a woman." Adubato claims that after this exchange, Toney wanted her to do news and not sports.

Adubato not only alleges that her assignments were discriminatory, she also claims that she was subjected to a sexually hostile environment at the station. Specifically, Adubato claims that Gorley and Toney constantly told her that "women should not be covering sports." Adubato claims that both Gorley and Toney told her: "Nobody in this town thinks you should be covering sports." She also alleges that Gorley told her countless times that Doug Bell, a *former* male sports director, thought that she should not be covering sports because women had no business doing sports. Gorley also complained loudly, although not in her presence, after Adubato planned to cover an Alabama football game.[2] Gorley told others in the newsroom that Adubato was not going to cover the game and didn't "get to decide" what her assignment was.

---

[2]   The evidence relating to Gorley's outburst concerning plaintiff's plans to cover an Alabama football game is probably not admissible as it is hearsay. The evidence consists of plaintiff testifying that she was telephoned by a camera operator, Kelly, and told of the outburst; she did not witness it herself. To give plaintiff the benefit of the doubt, it is recited here.

After Adubato complained to Land about Gorley's conduct, Adubato was allowed to cover the Alabama game.

At the Alabama football game, Adubato was told by Mike Raita, main sports anchor at another Birmingham television station, that Gorley was telling everybody that she did not know anything about sports and that she did not have any business having her job.[3] Adubato had a meeting with Land and Johnson and told them what Raita had told her and that she was humiliated and embarrassed by what Gorley was saying in the community about her.  Adubato also told Land and Johnson that Gorley was telling everyone at the station that Stefano Minervini, a technical director who helped Adubato edit, was just helping her because he was sleeping with her.[4]  Land told her that it was difficult being a woman in sports, and that she should let it "roll off of her."  On another occasion, Johnson told Adubato that she might be "too pretty to do sports."

Adubato complains that Gorley frequently locked the door to the sports office where Adubato's desk was located, even though she asked him several times to stop locking the sports office door. Adubato claims that during the first month of her employment she

---

[3]     This is another example of the inadmissible hearsay laced through much of the plaintiff's evidence.  This is an attempt to prove, through an extra-judicial statement by Raita, that Gorley was making disparaging remarks about her.

[4]     Adubato dated Minervini while she was working at WIAT, and, in fact, they lived together for about a year.

would go to her office and the door would be locked, with Finebaum, Gorley, and other male employees inside talking.   When they saw her, they would stop, open the door, and leave the office.   Adubato also testified that the work environment was hostile because she had no role in the planning of any sports coverage and was not invited or allowed to attend any sports planning meetings.

Adubato also alleges that she was afraid of Gorley.   Gorley was an auxiliary police officer on the weekends and would come to the sports office in uniform and wearing his gun on Saturdays and Sundays when Adubato was alone.   Adubato complained to Land, Johnson, and Ken Pilcher, the weekend supervisor, that Gorley had a gun at work.   There is no evidence that Gorley brandished the gun, pointed it at her, or otherwise threatened her with it.

Further, Adubato claims that Gorley made frequent jokes about former President Clinton and Monica Lewinsky by displaying cigars and a Clinton mask and making lewd comments.   She claims that Gorley put cigars in Adubato's desk drawer so she would see them there, and that he would wear the mask, mention Monica Lewinsky, and then make lewd comments relating to "dipping cigars."[5]  Adubato complained of Gorley's behavior to both Johnson and Land, but there

---

[5]     The court shudders to explain the significance of these remarks.   During 1999, it was revealed that President Clinton had engaged in a sexual relationship with Monica Lewinsky, sometime earlier, a part of which, it was reported, involved the President inserting cigars in Ms. Lewinsky's vagina.

is no evidence that Gorley was disciplined or the conduct stopped. According to Adubato, Gorley also told her that he and Finebaum frequented a local strip club, and that Land also liked to go to a private room at the strip club.[6]

Adubato complained to Land, Johnson, and other WIAT managers that she thought she was being discriminated against on the basis of her sex. She further complained to WIAT's parent company, Media General, and talked to a human resources employee about the discrimination. Adubato also told Finebaum that she thought she was being discriminated against based on her sex, but he did not do anything about it.

Part of the harassment about which Adubato complains occurred on the air, and not in her presence. In the summer of 1999, Finebaum made fun of women's sports fans on the air. On the July 12, 1999, broadcast, Finebaum went on the air wearing a bra outside of his clothes, with tennis balls stuffed inside the bra, apparently to lampoon Brandy Chastain, the women's soccer star who removed her shirt after a victory. Adubato alleges that Finebaum put his hands on the "fake breasts" and squeezed them. Adubato was offended by Finebaum's comments, and complained to Land after the

_____

[6]     Notwithstanding Gorley's apparent comments, Finebaum and Land both testified they had never been to the strip club.

incident.[7]  Land told Adubato that she was "overly emotional" and
that WIAT had hired Finebaum because of his "outrageous"
personality.  On another occasion, Finebaum said women's basketball
was "unwatchable," which Adubato also found offensive.

On March 11, 1999, Adubato was sent to Indianapolis during the
NCAA basketball tournament.  Adubato thought she was there to cover
Auburn University's basketball team;  instead, she and a male
cameraman were required to pick up credentials for two other
reporters from WIAT, who were not to arrive until later.  While in
Indianapolis, Adubato was required by Johnson to work on stories
other than live basketball broadcasts.  Adubato saw other sports
professionals that she knew while in Indianapolis and was
embarrassed that she was not covering the basketball games.

At some time before Adubato left WIAT, she was asked to speak
with a lawyer, regarding a lawsuit being brought against WIAT by a
black former employee, Ernie Freeman.  The attorney[8] asked her
whether the working environment at WIAT was a good one, and she
told him it was "hostile."  The attorney then became aggravated and
began to yell at her, asking "Why are you saying this?"

_____

[7]    Adubato also complains that on another occasion Finebaum
appeared on-air holding a Playboy magazine.  That incident
apparently occurred before Adubato was hired.

[8]    Although plaintiff never explains whom the attorney
represented, the court assumes for purposes of this motion that the
attorney was hired by WIAT.

Adubato's contract with WIAT provided restrictions on work Adubato could do for other employers while she was employed at WIAT.  The exclusivity provision of the contract provided:

> During the term of this Agreement, all of Adubato's services in radio and television are exclusive to WIAT and Adubato agrees that she will not, during the term of the Agreement and <u>without the prior written consent of WIAT</u>, perform any services, make any personal appearances, whether free or for a fee or authorize or permit the use of her name, voice, sobriquet, biography, recorded performance, picture, portrait, caricature or likeness by or in connection with any radio or television station which is not licensed to WIAT . . . .

WIAT's policy required that a written request be submitted by any employee seeking permission to "moonlight" and that permission be granted in writing by management before an employee could obtain outside employment.  Adubato signed a written acknowledgment of receipt of WIAT's policy.  Adubato performed "voice-over" work for a radio commercial while she was employed at WIAT.  Johnson recognized her voice on the radio and on February 2, 2000, informed Adubato that she was not allowed to do "voice-over" work because it could be construed as a conflict of interest.

In February of 2000, Adubato provided on-air commentary for the College Sports Southeast (CSSE).  Johnson saw Adubato on the air for CSSE.  WIAT considered CSSE to be a competitor.  Johnson recommended to Land that Adubato be terminated for violating the outside employment policy and the exclusivity provision in her

12

contract.  Adubato does not dispute that she worked for CSSE, but alleges that she received verbal permission from Johnson to perform the freelance work.  Adubato testified that Johnson said "you go, girl" when Adubato told her she was going to do some freelance work.[9]  On February 17, 2000, WIAT terminated Adubato for freelancing without written permission in violation of the exclusivity provision of her contract and the station's outside employment policy.  WIAT had previously terminated Adubato's predecessor, Sam Smith, for violating the same company policy.

Adubato filed an EEOC charge of discrimination on August 15, 2000.  Her right-to-sue letter was mailed from the EEOC on July 9, 2001, and she filed the present action on October 9, 2001.

### III. DISCUSSION

Defendant's motion for summary judgment seeks dismissal of: (1) plaintiff's claims of sexual harassment/hostile work environment and retaliatory dismissal based on Title VII, (2) plaintiff's claims for violation of the Equal Pay Act of the Fair Labor Standards Act, and (3) plaintiff's state-law claims of fraud and suppression.  For the reasons explained below, the court finds that the motion is due to be granted.

---

[9]  Plaintiff admits that when she mentioned to Johnson doing freelance work, she did not specify that the work would be for a competitor, like CSSE.

13

## A.  Title VII Sexual Harassment/Hostile Work Environment

### 1.  Timeliness

The defendant correctly asserts that Title VII requires a plaintiff to file a charge of discrimination with the EEOC within 180 days of the alleged violation and that failure to timely file is fatal to a Title VII claim.  The defendant also recognizes that there exists an exception to the 180-day limitation for conduct that constitutes a continuing violation.  See, e.g., Roberts v. Gadsden Memorial Hospital, 835 F.2d 793 (11th Cir. 1998).  The issue is whether the conduct complained of was part of a continuing pattern of harassment that continued into the 180-day limitations period.  The frequency of the conduct is one factor that is relevant to a determination of whether the conduct may constitute a continuing violation.

On the specific Title VII theory that the work environment is hostile due to sexual harassment, the courts have recognized that such a claim is one, unitary claim, even though it is composed of several or many events constituting the harassment.  Citing National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed. 2d 106 (2002), the United States Court of Appeals for the Eleventh Circuit recently explained:

> The [Supreme] Court issued a twofold ruling.  First, it held that "discrete discriminatory acts [such as termination, failure to promote, denial of transfer, or

14

refusal to hire] are not actionable if time barred, even when they are related to acts alleged in timely filed charges." National R.R. Passenger Corp., 122 S.Ct. at 2072. Second, and more important for our case, the Court held that a hostile work environment claim should be reviewed in its entirety, *so long as one of the events comprising it fell within the statute of limitations*. Specifically, the Court emphasized:

> A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1).... It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. *Provided that an act contributing to the claim occurs within the filing period*, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. [Italics added for emphasis].

Shields v. Fort James Corporation, 305 F.3d 1280, 1281-82 (11th Cir. 2002)(quoting National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed. 2d 106 (2002)). The 180-day time limitation for filing a charge of discrimination is satisfied if an act or event of harassment occurs within the filing period. If so, the hostile work environment claim "in its entirety" is timely. Conversely, if there are no events or acts of harassment within the filing period, the entire hostile environment claim is untimely.

In this case, even viewing the evidence in the light most favorable to the plaintiff, there are no events or acts of

harassment within the 180-day time limitation for filing a charge. Indeed, almost all of the events described by plaintiff as constituting the hostile environment occurred long before her employment terminated in February 2000.  The comments by Toney all ended by late 1998, when he was replaced as news director by Peggy Johnson.  The basketball tournament events occurred in March 1999, almost a year before she was terminated.   Likewise, the Clinton/Lewinsky jokes by Gorley happened in 1999, during the Clinton impeachment saga.[10]  In short, plaintiff can point to no acts or events of harassment contributing to a hostile work environment  that fell within 180 days of the filing of her EEOC charge.  Plaintiff filed her charge on August 15, 2000, so that the 180-day time period began on or about February 16, 2000. Plaintiff's employment was terminated on February 17, 2000.  Thus, a hostile work environment claim survives the 180-day filing deadline only if an act or event of harassment occurred on February 16 or 17, 2000.  Plaintiff has pointed to none, nor has the court been able to identify from the evidence any act or event occurring on those days (or anywhere near those days).[11]  Indeed, to the

_____

[10]    It appears that Gorley left his employment with WIAT sometime in 1999, long before plaintiff's employment was terminated in February 2000.  (See Adubato Depo. at pp. 183-4).

[11]    The fact of plaintiff's termination on February 17, 2000, cannot serve as an event or act constituting part of the hostile work environment claim.   Again, in National Railroad Passenger Corporation, the Supreme Court made clear that terminations are

extent that dates can be specified for some of the events described by plaintiff, all of them occurred many months before her employment was terminated in February 2000. There is no evidence that harassment or a hostile work environment continued to the day she was terminated. Consequently, plaintiff's hostile work environment claim is time barred.

To the extent plaintiff attempts to state a claim that WIAT discriminated by assigning her to news stories, rather than her preferred sports, such a claim also is time barred. Adubato admits that she knew, in 1998, within a month of being employed at WIAT, that she was being assigned news stories and was being precluded from covering sports. She complained to her agent and attorney, who corresponded with WIAT about the news assignments. The station pointed to Adubato's negotiated contract, which expressly allowed it to exercise its discretion in making assignments for her. She never undertook to file a charge or otherwise take action on this perceived discrimination until after she was terminated. Consequently, defendant's motion for summary judgment on the

---

distinct acts of discrimination, not part of a separate hostile work environment claim. To hold otherwise would be to allow Title VII plaintiffs to sweep up and preserve a variety of discrete Title VII claims (promotion denials, disciplinary infractions, demotions, and others) under the rubric of being part of a hostile environment claim, contrary to the Supreme Court's instructions that such claims be treated as distinct.

17

Title VII claims relating to job assignment is due to be granted on that basis.[12]

### 2.  Sexual Harassment/Hostile Work Environment

As an alternative basis for disposing of plaintiff's hostile work environment claim, the court also concludes that the events and acts complained of were not so severe and pervasive as to rise to the level of an actionable hostile environment.  The evidence fails to establish a sufficient level of severity and pervasiveness to constitute a *prima facie* showing of sex discrimination.

The plaintiff asserts that she is entitled to relief under Title VII because she was subjected to a hostile work environment. In order to prove a *prima facie* case, the plaintiff must

---

[12]    The court also finds that the claims relating to job assignment are due to be dismissed for the additional reason that they do not rise to the level of an "adverse job action" that is actionable under Title VII.  In essence, Adubato's complaint is that she was given news assignments rather than sports assignments. She was not demoted, paid less, denied a promotion, or terminated on account of her gender.  Viewed in the light most favorable to the plaintiff, what WIAT did was no more egregious than to assign her to cover news stories instead of sports stories because of her gender.  While it is clear that Adubato would have preferred to work only on sports stories, there is no evidence that the work on news stories was in any way "lesser" work in terms of status, pay, or job security.  Moreover, her contract clearly allowed WIAT to make the job assignments at its discretion.  Even if the court could concluded that WIAT assigned her to news rather than sports *because* of her gender, such did not constitute an "adverse employment action" that deprived her any terms, conditions, or privileges of employment.

18

demonstrate that her workplace was permeated with discriminatory behavior that was sufficiently severe or pervasive to create a hostile or abusive working environment.   Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed. 2d 295 (1993). To be actionable, the environment must be both objectively and subjectively hostile, and whether the workplace may be deemed hostile "can be determined only by looking at all the circumstances."   Id. at 23.   The relevant factors include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it is unreasonably interferes with an employee's work performance."   Id.   Once the plaintiff has demonstrated that she was subjected to a work environment that was both objectively and subjectively offensive, an employer is vicariously liable to a victimized employee where the hostile environment has been created by a supervisor "with immediate (or successively higher)" authority over the employee.   Faragher v. Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998).

The Eleventh Circuit Court of Appeals examined the "severe or pervasive" element of a Title VII claim in Gupta v. Florida Board of Regents, 212 F.3d 571 (11th Cir. 2000).  The court recognized that an essential element of any hostile environment sexual harassment claim is that the conduct complained of be sufficiently

19

severe or pervasive to alter the conditions of employment and to create a "hostile or abusive" work environment.  <u>See also</u> <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1245 (11th Cir. 1999).  Requiring such proof "ensures that Title VII does not become a mere 'general civility code.'" <u>Id.</u> at *7, quoting <u>Faragher</u>, 524 U.S. at 788. Likewise, in <u>Mendoza</u>, the court of appeals explained:

> Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal "civility code." <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 118 S. Ct. 998, 1000-02, 140 L. Ed. 2d 201 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed. 2d 662 (1998) ("A recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (internal citations omitted)); <u>Meritor [Savings Bank, FSB v. Vinson]</u>, 477 U.S. at 67, 106 S. Ct. 2399 ("Not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.").

<u>Id.</u> at 1245.  The court in <u>Gupta</u> went on to note that the requirement is critical to prevent the courts from turning ordinary socializing in the workplace into discriminatory conduct.  <u>Id.</u> Such ordinary socializing was deemed to include the "sporadic use of abusive language, gender-related jokes, and occasional teasing"

as well as horseplay and intersexual flirtation.  <u>Gupta</u>, 212 F.3d at 583.

As a result, the plaintiff must show that the conduct complained of goes beyond sexual joking that is generally accepted within the workplace.  The defendant correctly asserts that the Supreme Court has recognized that it is not enough for Abudato to show that her workplace was offensive; rather, she must show that WIAT's office was so permeated with discriminatory intimidation, ridicule, and insult that a reasonable person would perceive the environment as hostile or abusive.  <u>See</u> <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed. 2d 49 (1986).

In determining if this critical element of a sexual harassment claim has been met, the court must look to the frequency, severity, and pervasiveness of the conduct complained of.  Again, the court of appeals has said:

> The objective component of this analysis is somewhat fact intensive.  Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. <u>Allen v. Tyson Foods</u>, 121 F.3d 642, 647 (11th Cir. 1997) (citing <u>Harris</u>, 510 U.S. at 23, 114 S.Ct. 367).  The courts should examine the conduct in context, not as isolated acts, and determine under the

> totality of the circumstances whether the harassing
> conduct is sufficiently severe or pervasive to alter the
> terms or conditions of the plaintiff's employment and
> create a hostile or abusive working environment.

Id.; see Harris, 510 U.S. 17.

In this case, Adubato complains that she was told by a supervisor that she was hired because WIAT did "joke sports." She also was told on several occasions that women had no place in sports reporting. She further complains that she was locked out of the sports office on several occasions, and that she found cigars in her desk, which were part of jokes and comments made by Gorley about the Bill Clinton/Monica Lewinsky affair. Finally, Adubato complains that Finebaum on two occasions ridiculed women in sports on his sportscast, and that WIAT was somehow liable for Finebaum's comments because WIAT praised Finebaum's "outrageous" style.

The court first examines Adubato's complaints relating to women's coverage of sports. It appears that Adubato is attempting to take her discrimination claim relating to job assignments[13] and

---

[13]    Plaintiff has not pled a claim for discrimination in job assignments, and even if she has pled such a claim, limiting her assignments to non-sports related news does not amount to an "adverse employment action" for purposes of a *prima facie* showing under Title VII. Plaintiff's contract did not state that she was hired to do sports, but her assignments were completely at WIAT's discretion. Even if she understood that she was being hired as a sports reporter/anchor, assigning her to news reporting did not diminish her pay, benefits, status, or prestige. To constitute an "adverse employment action," the action must meet  "some threshold level of substantiality." Shannon v. BellSouth Telecommunications,

morph it into a hostile environment claim.  Most of the comments
about which Adubato complains were made by former employees or non-
supervisory co-workers.  Even if Adubato's claims are true and
supervisors at WIAT said Adubato shouldn't be covering sports or
knew that such comments had been made, those statements do not
constitute the type of severe and pervasive harassment that makes
up a hostile environment claim.  Such statements understandably may
have embarrassed and angered Adubato, but they are not severe or
pervasive enough to constitute sexual harassment.  See, e.g.,
Gupta, 212 F. 3d at 583.  Although offensive, they were not
physically threatening or humiliating, nor did they significantly
or unreasonably interfere with her job assignments as an on-air
news reporter and personality.

Adubato's next allegations relate to several incidents in
which she claims she would arrive at the sports office to find the
door locked and male broadcasters inside talking.  It is undisputed

_____

Inc., 292 F.3d 712 (11th Cir. 2002)(quoting Wideman v. Wal-Mart
Stores, Inc., 141 F.3d 1453, 1456 (11th Cir.1998).  "A tangible
employment action is 'a significant change in employment status,
such as hiring, firing, failing to promote, reassignment with
significantly different responsibilities, or a decision causing a
significant change in benefits.'"  Johnson v. Booker T. Washington
Broadcasting, 234 F.3d 501, 512 (11th Cir. 2000)(quoting Burlington
Industries, Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141
L.Ed.2d 633 (1998)).  Here, plaintiff's assignment to news stories,
rather than sports stories, did not affect the terms, conditions,
or privileges of her employment and, thus, cannot meet the prima
facie element of showing an "adverse employment action" taken
against her.

that she was always let into the locked room when she knocked.  The
fact that the men then left the room and quit talking may have been
rude or may have evidenced that they did not like to socialize with
Adubato, but it does not constitute harassment.  Adubato also
complains that she was excluded from sports meetings, but such
exclusion does not rise to the level of egregiousness necessary to
constitute sexual harassment, particularly if, within WIAT's
discretion, plaintiff was assigned to news stories, rather than
sports stories.

Adubato also alleges that she was subjected to a hostile
environment because Finebaum made fun of women on the air by
wearing a bra and poking fun at women's sports.  Nothing about
Finebaum's on-air antics, however tactless or crude, were in any
way directed toward Adubato.  While it is not difficult to
understand why Finebaum's actions were deemed offensive, they do
not rise to the level of actionable harassment and were not
directed toward the plaintiff.  There is no evidence that
Finebaum's behavior was physically threatening or humiliating, or
that it unreasonably interfered with plaintiff's work assignements.

Finally, Adubato complains that Gorley was allowed to work on
the weekends with a gun kept in his holster.  Gorley was an
auxiliary policeman, who sometime wore his uniform and gun to work
at the station.  There is no allegation that Gorley used the gun in
any way to threaten or intimidate Adubato.  There is no evidence

that anyone at WIAT ever physically threatened, touched, or harmed Adubato.  To the contrary, the evidence indicates that Gorley wore his gun because he also worked as a police officer.  The mere presence of the firearm in the workplace, even if unwise, does not constitute harassment of Adubato.

Adubato's conduct belies an additional element of her sexual harassment claim, which is that the conduct "unreasonably interfere[s] with the employee's job performance." Id. This factor also requires a showing of both subjective and objective interference with the job performance.  Id.  Adubato does not make any substantial showing that the conduct at WIAT interfered with her work, aside from the fact that she was required to do news reporting rather than sports reporting on several occasions. Adubato does not allege she was unable to perform her job as an on-air personality for WIAT, but simply that she was given job assignments that she did not want.

It has been noted that Title VII may not be used as a tool to punish "the ordinary tribulations of the workplace," Faragher, 524 U.S. at 788, or the failure to treat a female employee with "sensitivity, tact and delicacy," Minor v. Ivy Tech State College, 174 F.3d 855, 858 (7th Cir. 1999).  Moreover, the court is not permitted to police language in the workplace under the guise of enforcing Title VII.  Viewing all of Adubato's complaints in the light most favorable to her, the conduct of employees at WIAT was

sexist, rude, and condescending.  Even so, the actions were not so
frequent, severe, pervasive, or threatening as to constitute an
actionable hostile environment under Title VII.[14]  Consequently,
because the plaintiff has failed to demonstrate that the conduct
complained of is sufficiently "severe or pervasive" to support a
Title VII action, and because the defendant's conduct did not
"unreasonably interfere" with Adubato's job performance, the
defendants' motion for summary judgment is due to be granted.

### B.  Title VII Retaliation

The plaintiff alleges that she was terminated from her job at
WIAT in retaliation for her conduct in complaining about sex
discrimination and for testifying in a lawsuit brought against WIAT
by Ernie Freeman.   The plaintiff in a Title VII retaliation case
must establish a *prima facie* case by showing: (1) that she engaged
in protected conduct and (2) suffered an adverse employment action,
that was (3) causally linked to the protected expression.  Taylor
v. Runyon, 175 F.3d 861, 868 (11th Cir. 1999).   In addition, the

---

[14]    Although the defendant asserts an affirmative defense
based on it implementation of a sexual harassment policy, there is
at least a fact question as to whether the plaintiff reasonably
availed herself of WIAT's policies and procedures regarding
complaints of sex discrimination.  Accordingly, the defendant is
not  entitled  to  summary  judgment  on  the  basis  of  the
Faragher/Ellerth affirmative defense, but only on the grounds and
reasoning expressed in text.

plaintiff must show that her employer was aware of her participation in the protected activity when it took the adverse action. Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999).

Even if the plaintiff succeeds in establishing a *prima facie* case, the presumption of discrimination may be rebutted if the employer offers a legitimate, nondiscriminatory reason for the employment action.   Once the employer meets its burden of articulating a non-discriminatory reason, the burden shifts back to the plaintiff to show that the reason is either not worthy of belief or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proffered reason. Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

In this case, Adubato asserts that she was terminated because she complained about sex discrimination at WIAT and because she gave a statement against the company in a lawsuit brought by another employee.[15]  WIAT counters that Adubato's termination was

---

[15]     The court assumes, without deciding, the plaintiff has presented a *prima facie* showing of retaliation.  Neither party has provided sufficient facts from which the court can determine whether Adubato's participation in the lawsuit constituted a protected activity or whether WIAT knew of the contents of her statement.  Plaintiff also has failed to state when, in relation to the termination, the statement was made, except to argue in her brief that the incidents were "very close" in time.

based upon her violation of the company's policy regarding freelance work.[16]   Because WIAT has offered a nondiscriminatory reason for the termination, Adubato must demonstrate by competent, admissible evidence that WIAT's nondiscriminatory reason is merely a pretext for retaliation against her.  She must show not only that the articulated reason is false, but also that the defendant's true reason for the termination was retaliation.  See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993).  It is not the duty of this court to evaluate whether the decision to terminate Adubato was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

WIAT proffers as its nondiscriminatory reason for the termination of Adubato that she was fired because she violated company policy and her contract provision regarding other employment.  WIAT's reason is supported by several undisputed

---

[16]   The defendant further argues that Adubato did not complain about the alleged sexual harassment; however, taken in a light most favorable to the plaintiff, the court concludes that Adubato did complain both to her immediate supervisors, the station director, and the parent company's human resources department.  By all accounts, plaintiff first began to complain about the allegedly discriminatory working conditions at WIAT about a month after she was hired, in 1998.  Yet the discharge of which she complained came more than 18 months after she first began to complain to managers and co-workers.   There is no temporal connection between the complaints and the termination which might support a finding that the proferred reason was not credible.

facts:  (1) plaintiff concedes that she appeared as a broadcaster on CSSE; (2) defendant has produced the undisputed language of the prohibition against freelance work which requires an employee to obtain prior written permission before engaging in the outside work, and (3) plaintiff concedes that she did not receive written permission.  Plaintiff argues, however, that she told Johnson she had obtained outside work, and was told "you go, girl," which suffices as permission.  Plaintiff offers no evidence that oral permission was routinely sufficient or that male employees were allowed to freelance without the requisite written permission.[17] She also does not dispute that she did not reveal to Johnson that she planned to work a broadcast on a competing television network, College Sports Southeast.  Moreover, in working the broadcast on CSSE, plaintiff missed a broadcast she was scheduled to work on WIAT, telling supervisors that she could not make the broadcast because her daughter was ill.  There is simply no evidence that makes WIAT's nondiscriminatory reason for the firing "not worthy of belief."[18]

---

[17]    Although plaintiff argues that Finebaum was allowed to appear on radio and to write newspaper commentaries, the two situations are clearly inapposite.  Finebaum already worked as a columnist and radio host *before* he was hired by WIAT, and was hired by WIAT precisely because of his "name" in the community.

[18]    It is interesting to note that WIAT has demonstrated that a male broadcaster, plaintiff's predecessor, Sam Smith, was terminated for similar conduct prior to Abudato's employment with WIAT.

Accordingly, plaintiff's retaliation claim is without any support in fact or law, and defendant's motion for summary judgment on this issue is due to be granted.

### C.  Violation of the Equal Pay Act

In order to establish a *prima facie* case of a violation of the EPA, the plaintiff must show that her employer paid different wages to male and female employees for equal work, as described in the first part of the Act.  Mitchell v. Jefferson Cty. Bd. of Educ., 936 F.2d 539, 547 (11th Cir. 1991) (citing E.E.O.C. v. White & Son Enterprises, 881 F.2d 1006, 1009 (11th Cir. 1989)).  A plaintiff must show that her employer "pays different wages to employees of opposite sexes 'for equal work on jobs ... [requiring] equal skill, effort and responsibility, and which are performed under similar working conditions.'" Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)).   To establish a *prima facie* case, an employee "need only show discrimination in pay against an employee vis-a-vis one employee of the opposite sex." Mitchell, 936 F.2d at 547 (quoting White & Son Enterprises, 881 F.2d at 1009).  The plaintiff is not required to prove intentional discrimination, just that the employer pays unequal wages for equal work, as defined in the Act.  Mitchell, 936 F.2d at 547  To avoid liability, the employer must prove by a preponderance of the

30

evidence, Mulhall v. Advance Sec., Inc., 19 F.3d 586, 589-90 (11th Cir. 1994), that the difference in pay is justified by one of the exceptions set out in the EPA.  Corning Glass Works, 417 U.S. at 196-97.  The exceptions are: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  29 U.S.C. § 206(d)(1).  The burden is on the employer to prove these affirmative defenses, Corning Glass Works, 417 U.S. at 196-97, and the burden is a "heavy one." Mulhall, 19 F.3d at 590.  The defendant "must show that the factor of sex provided *no basis* for the wage differential."  Id.

The plaintiff has failed to set forth a *prima facie* case of a violation of the EPA.  Plaintiff has failed to provide evidence that she was being paid less than any male counterpart for equal work for a job that required equal skill, effort, and responsibility, and which was performed under similar working conditions.  Plaintiff testified that no one had the same or similar position as she.  Finebaum is not a sufficient comparator because his position was the lead sports anchor and sports director, requiring a different level of skill, effort, and responsibility.  Plaintiff admits that Finebaum was not in the same position as her.

31

Plaintiff further alleges that a former employee of WIAT, Ernie Freeman, made more than she did; however, Freeman also is an insufficient comparator.  Plaintiff testified that Freeman was a news anchors and that a sports anchor, which is the position plaintiff alleges she held, normally makes less.  Plaintiff has provided only general allegations of a pay disparity and has pointed to no sufficient comparator to show that any male was being paid more than she was for the same work.  In fact, plaintiff testified that she was "not really sure right now" whether she was complaining about her own salary on the basis of gender.  Plaintiff has not shown specific facts proving there is a genuine issue for trial nor has she provided sufficient evidence such that a jury could find in her favor.  For these reasons, defendant's motion for summary judgment as to plaintiff's Equal Pay Act claim is granted.

### D.  Fraud/Fraudulent Suppression Claims

Defendant argues in support of its motion for summary judgment that plaintiff's state-law fraud/fraudulent suppression claims are barred by the statute of limitations.  In Alabama, an action for fraud is subject to a two-year statute of limitations.  Ala. Code § 6-2-38(1).  Plaintiff began working for defendant on July 25, 1998.  She testified that she first felt defrauded soon after she was hired by defendant, sometime within the first month of her

32

employment. (Adubato Depo. pp. 333-34). Plaintiff testified it was "clearly within the first month of her employment" that she realized she had been defrauded. (Adubato Depo. pp. 335-36). The statute of limitations for fraud begins to run when the plaintiff knows or should know that the employer does not intend to perform as promised. Phillips v. Amoco Oil Co., 799 F.2d 1464, 1469 (1986) (citing Retail, Wholesale and Department Store Employees Union, Local 453 v. McGriff, 398 So. 2d 249, 252 (Ala. 1981)). This action was filed on October 9, 2001, more than three years after Adubato realized she had been defrauded.[19] Because Adubato filed her claim more than two years after first realizing WIAT was not going to perform as promised, any such fraud claim is barred by the statute of limitations. For the foregoing reasons, defendant's motion for summary judgment as to the state-law claims of fraud is due to be granted.

Alternatively, plaintiff's fraud claims are due to be dismissed because they fail to show that any presently existing fact was misrepresented. All of the statements relied upon by plaintiff to show fraud, namely those allegedly made by Micah Johnson during her interview for the job at WIAT, related either to future events or were simply his opinions. To state a claim for

---

[19]     Adubato even wrote in her calendar in 1999 that she intended to sue WIAT and that she was brought to Birmingham under "false pretenses."

33

fraud, the plaintiff must allege a misrepresentation of a material "existing fact," something more than opinions or "puffery" or predictions about the future.  See Cooper & Co., Inc. v. Lester, 832 So. 2d 628 (Ala. 2000); Mason v. Chrysler Corp., 653 So.2d 951 (Ala. 1995); Cain v. Saunders, 813 So. 2d 891, (Ala.Civ.App. 2001). Although a fraud claim can be grounded on promissory fraud, the plaintiff must prove there that the statement was made by the speaker while knowing it to be false and with the intent to defraud the plaintiff.   Adubato cannot show here that Micah Johnson knowingly lied to her either about her role at WIAT or the format of news and sports reporting at the station.   Indeed, plaintiff acknowledges that, before she took the job, she watched a newscast and was familiar with the format and, particularly the "Two Minute Drill" format for sports.

## IV.  CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented by both parties in support of and in opposition to the motion for summary judgment, this court determines that defendant's motion for summary judgment against plaintiff is due to be granted as to plaintiff's claims for Title VII claims of sexual harassment, her claims under the Equal Pay Act, and her state-law

claims of fraud and suppression.  Consequently, all of plaintiff's claims are due to be dismissed with prejudice.

A  separate  order  will  be  entered  in  accordance  with  the findings set forth herein.

Dated the _____ day of June, 2003.


T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE